AO 106 (Rev. 06/09)    Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Missouri

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISIS LOCATED AT:   27 W. ST. JOSEPH ST. PERRYVILLE, MO 63775 located in the Eastern District of Missouri. | ) **FILED UNDER SEAL** <br> ) <br> )   4:25 MJ 2124 JSD <br> ) <br> )  SIGNED AND SUBMITTED TO THE COURT <br>    FOR FILING BY RELIABLE ELECTRONIC <br>    MEANS |

## APPLICATION FOR A SEARCH WARRANT

I,   Patrick Dallas   , a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

SEE ATTACHMENT A

located in the   Eastern   District of   Missouri   , there is now concealed

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
    XX    evidence of a crime;
          contraband, fruits of crime, or other items illegally possessed;
          property designed for use, intended for use, or used in committing a crime;
          a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

Title 18, Section 1344 (Bank Fraud), and Title 18, Section 1349 (Conspiracy to Commit Bank Fraud)

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

    ✓    Continued on the attached sheet.
    ❏    Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under the penalty of perjury that the following is true and correct

_____
*Applicant's signature*
Patrick Dallas, SA, FBI
*Printed name and title*

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.

Date:   April 18, 2025   

_____
*Judge's signature*

City and State:   St. Louis, Missouri   

Honorable Joseph S. Dueker, U.S. Magistrate Judge
*Printed name and title*
AUSA: GWENDOLYN CARROLL

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:**<br>**27 W. ST. JOSEPH ST.**<br>**PERRYVILLE, MO 63775**<br>**UNDER RULE 41** | Case No.    4:25 MJ 2124 JSD<br><br>**Filed Under Seal**<br><br>SIGNED AND SUBMITTED TO THE COURT<br>FOR FILING BY RELIABLE ELECTRONIC MEANS |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, Patrick Dallas, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize the search of the premises known as 27 W. St. Joseph St., Perryville, MO ("Subject Premises"), further described in Attachment A, for the items described in Attachment B.

2.      I am a Special Agent (SA) with the FBI and have been so employed since 2009. I am currently assigned to the St. Louis Division, Cape Girardeau Resident Agency in Cape Girardeau, Missouri. In this capacity, I have been involved in investigating violations of various statutes, including but not limited to wire and mail fraud, among others. I have gained knowledge and experience through training at the FBI Academy, in-service training, and everyday work in conducting these types of investigations. I have participated in the execution of numerous search warrants, involving various types of investigations, including financial crimes. Many of the search warrants resulted in the seizure of documents, computers, cell phones and/or "smart phones," magnetic storage media for computers, other electronic media, and other items evidencing violations of federal laws.

1

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, Section 1344 (Bank Fraud), and Title 18, Section 1349 (Conspiracy to Commit Bank Fraud) have been committed by (1) JOHNSON & NISWONGER FINANCIAL RESOURCES, LLC; (2) James F. JOHNSON ("JOHNSON"); and (3) Darrell L. NISWONGER ("NISWONGER").  There is also probable cause to search the **Subject Premises**, further described in Attachment A, for the items described in Attachment B. The applied-for warrant would also authorize the forensic examination of digital devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## LOCATION TO BE SEARCHED

5.     The location to be searched is:

The business offices of Johnson & Niswonger Financial Resources, LLC ("**Subject Premises**") located at 27 W. St. Joseph St., Perryville, MO 63775. The **Subject Premises** is located within a two-story brick façade commercial building. The building contains multiple store fronts, with the **Subject Premises** located on the first floor of the building at the south-east corner of the intersection of W. St. Joseph St. and S. Jackson St. The front of the **Subject Premises** faces north on W. St. Joseph St., with a glass front door with the number "27" near the top. The name "Johnson Niswonger" is painted in white letters on the front glass door, as well as on glass windows to the left and right of the front door. The name "Johnson Niswonger" is also painted horizontally in blue

letters on a white background above the entrance door, and "JOHNSON" is painted vertically in white letters on a blue background on the front of the building on the right (west) edge.

## BACKGROUND OF THE FINANCIAL INVESTIGATION

6.      In October 2024, during a routine review of new potential criminal cases, the U.S. Attorney's Office for the Eastern District of Missouri received information from Enterprise Bank & Trust describing a potential Ponzi fraud scheme operating in Perryville, MO and the surrounding communities. A Ponzi scheme is a type of investment fraud in which early victim investors are paid with funds from newer victim investors, rather than from legitimate profits. It relies on a constant inflow of new capital to maintain the appearance of success and pay out returns to existing victim investors.

7.      Perryville, with a population of about 8,500, is the county seat of Perry County, located within the Eastern District of Missouri. The potential Ponzi fraud scheme was operating under the business name Johnson & Niswonger Financial Resources, LLC ("the Firm"), a Missouri limited liability company that was organized and filed with the Missouri Secretary of State on November 12, 2002, and was assigned Charter No. LC0073431. The organizers of the LLC, as filed with the Secretary of State, are James F. JOHNSON and Darrell L. NISWONGER, both of whom are currently residents of Perryville, MO. James F. JOHNSON is listed as the registered agent for the LLC, with an address of 27 W. St. Joseph St., Perryville, MO 63775, which is the **Subject Premises**. The addresses for each organizer, JOHNSON and NISWONGER, are also listed as 27 W. St. Joseph St., Perryville, MO 63775, the **Subject Premises**. The Firm's LLC filing stated that the purpose of the LLC is "Providing financial services and products to the public, and for any legal purpose under the Act." A query of the public website of the Missouri Secretary of State, conducted on April 13, 2025, indicates that the LLC remains active.

3

### *FINANCIAL RECORDS ESTABLISHING AN INVESTMENT FRAUD SCHEME*

8.      A subpoena for bank records relating to the Firm's checking account at Enterprise Bank & Trust, as well as for JOHNSON's and NISWONGER's personal bank accounts at the same bank, was served in October 2024, with follow-up subpoenas served in February and April 2025 requesting additional information. A subpoena to US Bank for additional personal bank accounts held by JOHNSON, was served in December 2024.

9.      A review of the Firm's checking account #**3346 at Enterprise Bank & Trust was conducted for July 2017 through January 2025, with July 2017 being the limit of the bank's records retention period. The Firm consistently used the address of the **Subject Premises**, 27 W. St. Joseph St., Perryville, MO 63775, on its bank statements at Enterprise Bank & Trust from July 2017 until the closure of the checking account in January 2025.

10.      As more fully described below, the review of the Firm's checking account revealed traits of a Ponzi fraud scheme, including:

      a.  The recruitment of new victim investors, or alternatively, the solicitation of new payments from existing victim investors, to ensure the continued flow of cash into the Firm.

      b.  The use of funds from new victim investors to make payments to prior victim investors.

      c.  The diversion of victim investor funds to the operators of the scheme, either through direct payments to the operators, or to pay for products or services that benefitted the operators.

    d.  A lack of evidence of the use of victim investor funds to purchase stocks, bonds, mutual funds, real estate, or any other security or asset that would generate the returns that were promised to victim investors.

11.    The Firm's checking account is funded primarily from two sources: (1) checks from individuals who appear to be investing funds with the Firm; and (2) commission income from companies that sell annuity and other financial products to consumers, including Assurity Life Insurance Company, EquiTrust Life Insurance Company, Midland National Life Insurance, North American Company for Life and Health Insurance, and Protective Life Insurance Co.

12.    Approximately 181 check deposits from individual victim investors were made into the Firm's checking account at Enterprise Bank & Trust from July 2017 through January 2025. The checks written by the victim investors were drawn on accounts held at a number of federally insured financial institutions, including Alliance Bank, Regions Bank, US Bank and the Bank of Missouri. The deposits range in amount from $100 up to $155,000, and are typically made out to "Johnson and Niswonger Financial Resources" or similar names ("Johnson and Niswonger," "Johnson and Niswonger Financial," etc.). Approximately 42 of the 181 checks had a notation on them indicating the purpose of the check was some form of an investment, such as "Investment 5%," "Municipal bonds," "note," or "3 yr 4%." Many of the individuals wrote multiple checks to the Firm. The sum of the 181 potential victim investor deposits into the Firm's checking account is approximately $4.6 million. Most of the potential victim investors are from Perryville, MO and the surrounding communities, with one victim investor currently residing in Waterloo, IL, in the Southern District of Illinois.

13.    The other primary source of income to the Firm, consisting of commission payments from the sales of annuity products from EquiTrust Life Insurance Company, Midland

National Life Insurance Company, and the other companies listed above, totaled approximately $495,000, and was deposited electronically by the various insurance companies into the Firm's checking account. Subpoenas to EquiTrust and Midland confirm that commissions were paid to JOHNSON and NISWONGER for the sale of the companies' annuity products to clients of the Firm, and the commissions were typically divided equally between JOHNSON and NISWONGER. Some of the clients that purchased EquiTrust and/or Midland annuity products also invested directly with the Firm, while other purchasers of EquiTrust's and Midland's annuities do not appear to have invested directly with the Firm. There is currently no evidence that funds associated with the sale of annuity products to clients of the Firm have been misappropriated.

14.    The Firm's victim investor checking account records indicate that the Firm wrote checks to make payments to prior victim investors, as opposed to direct bank transfers or wire transfers. NISWONGER signed the checks issued to prior victim investors. On some checks, NISWONGER made notations on the check indicating a return payment to an victim investor, such as "Investment #4," "Contract pd. out & complete," or "Interest at maturity." Approximately seventy-nine individuals appear to have received several hundred payments from the Firm's checking account, totaling approximately $1.7 million.

15.    The firm's victim investor checking account records show that monthly payments were made to JOHNSON and NISWONGER, typically two payments of $7,500 to each partner, for a total of $15,000 per month, to each partner. Some months had lower disbursements when limited cash flow didn't allow for the full $15,000 payment to each partner. JOHNSON was paid with checks written from the firm's checking account that were deposited by JOHNSON into his US Bank checking account #******7899, while NISWONGER was typically paid via a direct bank transfer to his personal checking account #**7318 at Enterprise Bank & Trust. During some

6

months, JOHNSON and NISWONGER received additional checks from the firm's account for reimbursement of cell phone, healthcare, or other miscellaneous expenses. On some occasions there were also checks written by NISWONGER made out to "cash." Payments from the firm's client investment account, funded by victim investor deposits, to JOHNSON and NISWONGER totaled approximately $2.4 million.

16.    A breakdown of how victim investor deposits were utilized by JOHNSON and NISWONGER out of the firm checking account from July 2017 through January 2025 show over 50%, approximately $2.5 million spent on payroll expenditures, predominately paid to JOHNSON and NISWONGER and their respective spouses ($2.4). Approximately $1.5 million of victim investor deposits are used to fund repayments to previous victim investors, all paid via checks signed by NISWONGER. Over $300,000 of victim investor deposits are used to pay for premiums paid on personal insurance policies held by JOHNSON and NISWONGER and their families, personal debt consolidation loans, to the benefit of JOHNSON and NISWONGER. The remaining funds (approximately $261,000) were spent on a variety of overhead expenses typically required to operate a physical office, including (1) rent; (2) utilities such as electricity, phone, TV, internet, etc.; (3) payroll and payroll expenses for office help; (4) office supplies and office upkeep such as pest control and IT services; and (5) accounting services.

17.    On December 6, 2024, the firm opened a new checking account #***1417 at First State Community Bank ("FSCB") and the firm's prior victim investor checking account at Enterprise Bank & Trust was closed on January 9, 2025 (NISWONGER also opened a new personal checking account at FSCB and closed his personal account at Enterprise Bank & Trust around the same time). Subpoenas were served on FSCB for the firm's new victim investor checking account, as well as for personal accounts associated with JOHNSON and NISWONGER.

FSCB's subpoena response indicated that the firm's new account at FSCB continued to be used to conduct firm business, including receiving new victim investor deposits totaling $270,000, receiving commission payments for annuity sales to clients, issuing checks to previous victim investors, making payments to JOHNSON and NISWONGER, paying for insurance premiums that benefitted JOHNSON and NISWONGER and their families, and continuing to pay for the firm's office overhead expenses.

18.    At least one victim investor noted "Municipal Bonds" in the "For" section on two of their investment checks to the firm. Multiple victim investors have stated they were told by NISWONGER that their investments were in municipal bonds. Investigators have not located evidence of payments being made to government entities which would have issued municipal bonds. Additional victim investors have stated they were informed by JOHNSON or NISWONGER that their investments were bought and sold to other investors, put into a "fund" that drew interest, or were provided no additional information as to where their money was being invested.

19.    The investigation indicates that the Ponzi fraud scheme pre-dated July 2017, but due to the July 2017 records retention cut-off date in place at Enterprise Bank & Trust, the total potential loss to victim investors over the life of the scheme may exceed the losses reflected in the records obtained by investigators to date.

20.    On April 15, 2025, FSCB provided updated monthly statements for the Firm's checking account #***1417 that cover the time frame of February 3, 2025, through March 31, 2025 (check images extending to April 10, 2025 were also provided). The FSCB records indicate that the Firm continues to engage in financial activity consistent with an investment fraud scheme, including the deposit of additional checks from victim investors, payments made directly to

JOHNSON and NISWONGER, payments made to previous investors, payments for JOHNSON and NISWONGER's personal benefit, such as for personal insurance premiums, and payments for office expenses, such as rent.

**FALSE REPRESENTATIONS MADE TO VICTIM INVESTORS**

21.     Multiple victim investors have stated they were told by NISWONGER that their investments were in municipal bonds. Neither the Firm's Enterprise Bank & Trust #**3346 account nor their FCSB account #***1417 reflects payments being made to the government entities which would have issued municipal bonds. Additional victim investors have stated they were informed by JOHNSON or NISWONGER that their investments were bought and sold to other investors, put into a "fund" that drew interest, or were provided no additional information as to where their money was being invested.

22.     Upon completion of a review of the Firm's bank statements, investigators interviewed potential victim investors. Some of those individuals provided copies of documents relating to their investments with the Firm. Summaries of the information received from some of the victim investors is as follows:

*VICTIM INVESTOR LT*

23.     Early in the investigation, LT, a witness who invested directly with the Firm, but did not suffer a financial loss, provided a copy of an investment contract she entered into with the Firm:



24.     The "FIVE YEAR INTEREST BEARING INVESTMENT" document given to LT
was prepared on Johnson & Niswonger letterhead and dated November 8, 2018.  The document
uses the **Subject Premises** address in the header and promises a 5% annual return for a period of
five years on an initial investment of $50,000. The document does not state how the funds are to
be invested to obtain the 5% annual return. A review of the Firm's checking account shows the

10

funds from this investment can be traced to the following expenditures and purchases, none of which are investment instruments yielding 5% returns:

    a.  Approximately 83% ($41,000) of these funds went to pay both NISWONGER and JOHNSON via check or bank transfer into their personal checking accounts.

    b.  Approximately 8% ($4,100) of these funds went to pay premiums on insurance policies for the personal benefit of NISWONGER or JOHNSON.

    c.  Funds were used to make payments to two previous victim investors, both of which were via checks signed by NISWONGER.

    d.  The remaining funds were spent on various office expenditures, such as utilities, staff payroll, and retail purchases.

25.    There is no evidence in the Firm's victim investor checking account that LT's $50,000 payment was actually invested in anything that could provide a 5% annual return. In fact, the Firm's victim investor checking account into which the $50,000 check was deposited is a non-interest bearing account.

### *VICTIM INVESTOR CB*

26.    CB, a resident of Perry County, MO, within the Eastern District of Missouri, stated that he utilized the Firm to make a $25,000 investment with EquiTrust Life Insurance, as well as $25,000 and $50,000 investments directly with the Firm. CB stated that he wrote a check directly to EquiTrust for the life insurance policy. For the $25,000 and $50,000 investments CB made directly with the Firm, CB made the checks payable to the Firm. Images of CB's $25,000 and $50,000 checks to the Firm were located in the Firm's investment checking account statements.

11

27.    The written agreement for CB's $25,000 investment directly with the Firm, dated September 18, 2020, is shown below (CB's $50,000 investment, dated February 12, 2021, included a similar agreement and is not shown here):

Client Cy −

Johnson **N**iswonger
FINANCIAL RESOURCES, L.L.C.

27 W. St. Joseph Street • Perryville, MO 63775
573-547-7400 • Toll Free 877-517-7400 • Fax 573-547-7058

FIVE YEAR INTEREST BEARING INVESTMENT

Note for $25,000. at 5% interest for a period of five years, by and between Johnson-Niswonger Financial Resources, LLC, and C▮▮▮▮ B▮▮▮▮▮▮ ▮▮▮▮▮▮ residing at ▮▮▮▮▮▮▮▮▮▮▮▮ MO. Contract begins on September 19, 2020, and completes on September 18, 2025.

Interest will accrue to principal and can be taken tax free, annually, upon request of investor. Beneficiary to this contract is ▮▮▮▮▮▮▮▮ ▮▮▮▮ and is payable upon his death, at competition of contract.

Entered into on this date, September 18, 2020, by and between C▮▮▮ B▮▮ and The Johnson-Niswonger Financial Resources, LLC.

Investor: ▮▮▮▮▮▮▮▮▮▮▮▮

Johnson-Niswonger Financial Resources, LLC

CB's agreement reflects the address of the **Subject Premises**.

28.     CB stated that JOHNSON never indicated that his investments constituted a loan to the Firm, in which the Firm would pay CB 5% interest over the course of five years. CB stated that had JOHNSON asked CB to <u>loan</u> the Firm $75,000 for a return of 5% interest over five years, CB would <u>not</u> have entered into such an agreement.

29.     A review of the firm's bank statements indicates that CB's September 2020 $25,000 investment funded the following: (1) insurance premium payments that benefitted JOHNSON, NISWONGER, and their families; (2) payments to JOHNSON and NISWONGER; (3) payments to four prior victim investors; and (4) overhead expenses for operation of the firm's office.

30.     A review of the firm's bank statements indicates that CB's February 2021 $50,000 investment funded the following: (1) insurance premium payments that benefitted JOHNSON, NISWONGER, and JOHNSONS's spouse; (2) payments to JOHNSON and NISWONGER; (3) payments to five prior victim investors; and (4) overhead expenses for operation of the firm's office.

31.     There is no evidence in the Firm's victim investor checking account that CB's $25,000 and $50,000 payments were actually invested in anything that could provide a 5% return. As noted previously, the Firm's victim investor checking account into which the $25,000 and $50,000 checks were deposited is a non-interest bearing account.

32.     During the week of March 31, 2025, CB exchanged text messages with JOHNSON via JOHNSON's mobile telephone, (573) 768-9826, in order to arrange a meeting with JOHNSON at the **Subject Premises** in order to discuss CB's investments.

33.     On April 4, 2025, CB met with JOHNSON at the **Subject Premises**.  During that meeting, JOHNSON told CB that CB's two five-year investments with the Firm were not annuities,

13

but rather were contracts that were bought and sold between other investors.  JOHNSON further stated that CB would not receive any information regarding his Firm investments until they matured. Upon maturity, CB was told that he would receive a check from the Firm for his initial investments, plus the 5% interest, and would receive his funds within three to seven business days. CB stated that JOHNSON told him there would be no tax penalties for withdrawing the five-year investments at the end of their terms, and that CB would not receive a Form 1099 from the Firm.

### *VICTIM INVESTOR CR*

34.    CR, a resident of Cape Girardeau County, MO, within the Eastern District of Missouri, stated that she first met NISWONGER when she and her previous husband were looking to purchase life insurance. After the death of CR's husband, she made multiple other investments through the Firm, to include accounts with Midland National Life Insurance and EquiTrust Life Insurance. CR said she also has made multiple investments directly with the Firm. CR believes that she has withdrawn some of the interest available to her in the past but has not tried to withdraw all of her money upon maturity, instead allowing the funds to roll over into a new investment. CR recalled telling NISWONGER that if the investments ended up being bad, and she ran out of money, that she would be moving in with him and he would have to take care of her.

35.    CR provided investigators with copies of seven investment agreements she made with the Firm, one of which (dated July 18, 2024) is shown below.  As with the investment agreements described above, this investment agreement reflects the address of the **Subject Premises**:



36.   CR's seven investment agreements consisted of the following:

a.   August 9, 2012 – "FIVE YEAR INTEREST BEARING INVESTMENT"
(shown above), in the amount of $20,000 at 5% interest. The handwriting at
the bottom of the document indicates that upon maturity on August 10, 2017,
the investment was rolled over into another five year, 5% interest investment.
This transaction pre-dated the record retention period of Enterprise Bank &
Trust, so the deposit of the 2012 check into the Firm's investment checking
account could not be verified.

b.   August 15, 2014 – "TEN YEAR INTEREST BEARING NOTE," in the
amount of $60,616 at 5% interest. A sentence in the agreement states "This
note includes and voids the note for $12,000 (Accumulated value $18,616.)
written on August 17, 2006," indicating that the Firm has been issuing this type

of investment since at least August 2006. This transaction pre-dated the record retention period of Enterprise Bank & Trust, so the deposit of this 2014 check (and the referenced 2006 check) into the Firm's investment checking account could not be verified.

c. November 12, 2014 – "FOUR YEAR INTEREST BEARING NOTE," in the amount of $30,000 at 6% interest. This transaction pre-dated the record retention period of Enterprise Bank & Trust, so the deposit of this 2014 check into the Firm's investment checking account could not be verified.

d. November 12, 2018 – "FIVE YEAR INVESTMENT NOTE," in the amount of $30,000 at 6% interest. The agreement indicates that this is a rollover of the investment discussed above in item c, and thus no check was written by CR.

e. December 18, 2018 – "FIVE YEAR INTEREST BEARING NOTE," in the amount of $11,000 at 6% interest. An image of CR's check was located in the Firm's victim investor checking account statements, and the image indicates that CR wrote "Investment 5%" in the "For" section of the check (even though the NOTE indicates a 6% interest rate).

f. May 12, 2021 – "FIVE YEAR INTEREST BEARING NOTE," in the amount of $40,000 at 6% interest. Images of two checks by CR were located in the Firm's victim investor checking account statements totaling $40,000 – one for $35,000 dated April 14, 2021 with the notation "investment," and a second for $5,000 dated May 12, 2021.

g. July 18, 2024 – "FIVE YEAR INTEREST BEARING NOTE," in the amount of $65,245 at 6% interest. Images of two checks by CR were located in the Firm's victim investor checking account statements totaling $65,245 – one for $50,245 dated July 8, 2024, and a second for $15,000 dated July 18, 2021.

37.     An additional check from CR, dated August 18, 2022, and in the amount of $75,000, was located in the Firm's victim investor checking account statements, even though CR did not provide a copy of a corresponding "NOTE" or "INVESTMENT" to investigators. CR's checks to the Firm total $191,245.

38.     NISWONGER provided an account balance statement to CR on April 1, 2021, which shows the balances of CR's investments with Midland National Life Insurance and EquiTrust Life Insurances on page 1, and the balances of her Firm investments on page 2, shown below:



39.    NISWONGER appears to have provided balances for three of CR's investments on April 1, 2021 (the typed portion), as well as updated handwritten balances for five investments on July 19, 2022. For the 2022 update, CR's five investments with the Firm total $212,704.82. The Firm's victim investor checking account statement for July 2022 indicates that the Firm had a balance of $73,734.90 on the handwritten date of the account balance update, July 19, 2022, which is substantially lower than the supposed value of CR's investments of $212,704.82. Note that the $212,704.82 investment figure reported to CR by NISWONGER on July 19, 2022 does not include CR's later investments of $75,000 on August 18, 2022, $50,245 on July 8, 2024, and $15,000 on

July 18, 2024. In total, it appears CR has invested at least $352,949.82 from August 2006 through July 2024. CR stated that she may have received interest payments in the past on some of her investments with the firm, but investigators could not identify any "interest" payments to CR in Enterprise Bank & Trust records from July 2017 to the present.

40.     A review of the Firm's December 2018 bank statement indicates that in the two weeks following CR's $11,000 investment on December 18, 2018, payments were made from the Firm's victim investor account #**3346 for (1) insurance premium payments that benefitted JOHNSON, NISWONGER, and their families; (2) $7,500 withdrawals each to JOHNSON and NISWONGER; (3) a payment to a prior victim investor; and (4) overhead expenses for operation of the Firm's office.

41.     A review of the Firm's April 2021 bank statement indicates that in the two weeks following CR's $35,000 investment on April 14, 2021, payments were made from the Firm's victim investor account #**3346 for (1) insurance premium payments that benefitted JOHNSON, NISWONGER, and their families; (2) $15,000 withdrawals each to JOHNSON and NISWONGER, plus an additional $500 to NISWONGER; (3) a payment to a prior victim investor; and (4) overhead expenses for operation of the Firm's office.

42.     A review of the Firm's May 2021 bank statement indicates that in the two weeks following CR's $5,000 investment on May 12, 2021, payments were made from the Firm's victim investor account #**3346 for (1) insurance premium payments that benefitted JOHNSON, NISWONGER, and JOHNSON's spouse; (2) $7,500 withdrawals each to JOHNSON and NISWONGER; (3) a payment to a likely prior victim investor; and (4) overhead expenses for operation of the Firm's office.

43.     A review of the Firm's August 2022 bank statement indicates that in the two weeks following CR's $75,000 investment on August 8, 2022, payments were made from the Firm's victim investor account #**3346 for (1) insurance premium payments that benefitted JOHNSON, NISWONGER, and their families; (2) $7,500 withdrawals each to JOHNSON and NISWONGER; (3) payments to prior victim investors; and (4) overhead expenses for operation of the Firm's office.

44.     A review of the Firm's July 2024 bank statement indicates that in the two weeks following CR's $50,245 investment on July 8, 2024, payments were made from the Firm's victim investor account #**3346 for (1) insurance premium payments that benefitted JOHNSON, NISWONGER, and their families; (2) $7,500 withdrawals each to JOHNSON and NISWONGER; (3) a payment to a prior victim investor (including a notation by NISWONGER on one check saying "Close out account"); and (4) overhead expenses for operation of the Firm's office.

45.     A review of the Firm's July 2024 bank statement indicates that in the two weeks following CR's $15,000 investment on July 18, 2024, payments were made from the Firm's victim investor account #**3346 for (1) insurance premium payments that benefitted JOHNSON, NISWONGER, and their families; (2) $7,500 withdrawals each to JOHNSON and NISWONGER; (3) payments to prior victim investors (including a notation by NISWONGER on one check saying "Close out account"); and (4) overhead expenses for operation of the Firm's office.

46.     There is no evidence in the Firm's victim investor checking account that CR's victim investor payments were actually invested in anything that could provide a 5% return (or 6% as promised in some of CR's investment documents). As noted previously, the Firm's victim investor checking account into which CR's checks were deposited is a non-interest bearing account.

*VICTIM INVESTOR CS*

47.    CS, a resident of Cape Girardeau County, MO, in the Eastern District of Missouri, stated that he has been a client of the firm for many years. He said he has multiple investments with the firm, including investments with Midland National Life Insurance, New York Life Insurance, and several municipal bond investments. CS said he was told that his municipal bond investments with the firm were for bridge projects, city projects, or for borrowing by the government, and could be located all over the United States. CS said he wrote checks directly to Midland and New York Life for those investments, and when investing in what CS was told were municipal bonds, he wrote checks directly to the firm. CS said he typically dealt with JOHNSON regarding his Midland and New York life investments, and with NISWONGER regarding his municipal bond investments.

48.    A review of the firm's investment checking account showed two check deposits from CS – one dated January 9, 2020, in the amount of $10,000, and a second dated August 29, 2023, in the amount of $60,000.

49.    CS said he has taken money out of his Midland account in the past, but did not recall withdrawing any of the interest or matured investments in the municipal bonds because he has no plans for the proceeds. However, the Firm's Enterprise Bank & Trust account records reflect that CS received two disbursements from the Firm – one in the amount of $5,695.17 and one in the amount of $13,554.61.  CS said he was under the impression that the firm would notify him when the bonds had matured or they would just renew automatically. He said that when he withdrew money from his Midland account in the past, he had to pay taxes; however, it was CS's understanding that there were no tax penalties associated with his municipal bond investments with the firm.

50.     CS provided Investigators with copies of two "Five Year Interest Bearing Notes",

one dated January 9, 2020, and the other dated August 29, 2023. Both are similar, and the note

dated January 9, 2020, is shown below:



**FIVE YEAR INTEREST BEARING NOTE**

Investment of $10,000.00, for a 5 (five) year period at 5.0%.

Beginning on January 9, 2020 and completing on January 9,

2025.  Interest will accrue to principal, but can be withdrawn

annually upon notice of investor.

Entered into on this date, January 9, 2020, by and between C██ S██

and the Johnson & Niswonger Financial Resources, LLC.

INVESTOR:  _____

Johnson & Niswonger Financial Resources, LLC

_Johnson : Niswonger Financial Resources, LLC_

51.     A review of the firm's bank statements indicates that CS's January 2020 $10,000

investment funded the following: (1) insurance premium payments that benefitted JOHNSON,

NISWONGER, and NISWONGER's family; (2) a payment to NISWONGER; (3) payments to three prior victim investors; and (4) overhead expenses for operation of the firm's office.

52.    A review of the firm's bank statements indicates that CS's August 2023 $60,000 investment funded the following: (1) insurance premium payments that benefitted JOHNSON, NISWONGER, and NISWONGER's family; (2) a payment to NISWONGER; (3) payments to four prior victim investors; and (4) overhead expenses for operation of the firm's office.

53.    One of the documents that CS provided to Investigators was a list of accounts and balances, dated August 22, 2023, prepared on Johnson & Niswonger letterhead, signed by NISWONGER, and claiming to show the values for CS's investments with Midland National Life Insurance as well as with the Firm:



54.    Section 4 of the account balance statement shows four of CS's investments that were made directly with the Firm (his fifth investment of $60,000 occurred a week later on August 29, 2023). On the right side of the statement, NISWONGER, on behalf of the Firm, provides current values of the four investments, which total $105,310.50. The Firm's victim investor checking account statement for August 2023 indicates that the Firm had a balance of $64,845.82 on the date of the account balance statement, August 22, 2023.

55.    There is no evidence in the Firm's victim investor checking account that CS's $10,000 and $60,000 payments were actually invested in anything that could provide a 5% return. As noted previously, the Firm's victim investor checking account into which the two checks were deposited is a non-interest bearing account.

## THE SUBJECT PREMISES

56.    United States Postal Service records indicate that Firm personnel have received mailings at the **Subject Premises** through at least as late as March 2025. The latest Firm bank statement from FSCB, dated March 31, 2025, used the address of the **Subject Premises**.

57.    The address of the **Subject Premises** appears on the header of communications received from the Firm by multiple victim investors, including CS, CB, LT and CR.

58.    On April 10, 2025, Investigators conducted physical surveillance at the **Subject Premises**. The following observations were made during the surveillance:

  a.  Upon arrival at the **Subject Premises**, Investigators noted that the exterior of the **Subject Premises** continued to show signage of the Firm.
  b.  At approximately 10:30 a.m., Investigators observed a gold GMC Yukon, known by Investigators to be registered to JOHNSON, parked on the street in front of the **Subject Premises**. Additionally, Investigators observed a maroon Ford F-150, known by Investigators to be registered to NISWONGER, parked on the street besides the **Subject Premises**.
  c.  At approximately 11:02 a.m., investigators observed an individual matching the description of JOHNSON leaving the **Subject Premises** in the gold GMC Yukon known to belong to JOHNSON.

59.     On April 4, 2025, victim investor CB met with JOHNSON at the **Subject Premises** in order to discuss CB's investment.

60.      Missouri Secretary of State records reflect the address of the **Subject Premises** as the location of the Firm, and describe the business of the Firm as providing "financial services." Based on my training and experience, I am aware that businesses engaging in financial services, both legitimate and fraudulent, typically maintain records of their financial activities at their business premises.

61.     The documents given to multiple victim investors by JOHNSON and NISWONGER are word processed documents, created on and printed from a computer. The header of the documents frequently reflects the address of the **Subject Premises**.

62.     The week of April 7, 2025, victim investor CS contacted NISWONGER via the telephone and arranged to meet with NISWONGER on April 15, 2025 at the **Subject Premises** to discuss CS's investment.

63.     On April 15, 2025, CS and CS's son JS met with NISWONGER at the **Subject Premises.** CS observed a laptop computer in NISWONGER's office. During the meeting at the **Subject Premises**, NISWONGER provided CS with a printed account statement that identified thousands of dollars in "municipal bond" investments. NISWONGER was unable to provide any specific information regarding the municipal bonds, beyond saying that they were issued through a company based in Nebraska. During the meeting, NISWONGER used his mobile telephone to calculate CS's account balance.

## USE OF MOBILE AND DIGITAL DEVICES
## IN FURTHERANCE OF THE FRAUD SCHEME

64.     During the course of the investigation, victim investor CB provided investigators with mobile telephone number (573) 768-9826 as belonging to JOHNSON. CB had communicated with JOHNSON on this phone number as recently as the week of March 31 – April 4, 2025. The communication between the victim investor and JOHNSON was regarding scheduling a meeting with JOHNSON to go over their investments.

65.     During the week of March 31, 2025, victim investor CB exchanged text messages with JOHNSON via JOHNSON's mobile telephone using number (573) 768-9826.

66.     On April 10, 2025, investigators used a law enforcement database to conduct a search of cellular telephone number (573) 768-9826. The results of the search determined the phone number is associated with James JOHNSON, P.O. Box 168, Perryville, MO 63775, and Dee JOHNSON, 4701 Highway B, Perryville, MO 63775.  The wireless communications provider for the cell phone registered to James JOHNSON is T-Mobile.

67.     During the course of the investigation, victim investor CJ provided investigators with cellular telephone number (573) 517-1321 as belonging to NISWONGER. The investor had communicated with NISWONGER on this phone number as recently as the week of April 7 – 10, 2025. NISWONGER communicated with the victim investor using cellular telephone number (573) 517-1321 in order to schedule a meeting regarding the funds the victim investor had invested with the Firm.

68.     On April 10, 2025, investigators used a law enforcement database to conduct a search of cellular telephone number (573) 517-1321. The results of the search determined the phone number is associated with Darrell NISWONGER, 1139 Zita St., Perryville, MO 63775. AT&T is the wireless telecommunications provider for NISWONGER's mobile (573) 517-1321.

69.     Records obtained from the Firm's current bank, FSCB, indicate that a Business Digital Banking Enrollment was completed by NISWONGER on December 20, 2024 for the Firm's new victim investor checking account at the bank. The Enrollment also authorized digital banking for two personal accounts at FSCB associated with NISWONGER.

70.     The records also included a User Activity Report showing records of digital access (which would be performed via a computer or mobile phone) to the Firm's account from February 1, 2025 to April 10, 2025. The following transfers were made out of the Firm's business account through the use of digital banking:

| Date | Logon Time | IP address | ISP | Note |
|---|---|---|---|---|
| 2/2/2025 | 6:20:01 | 75.133.157.94 | Charter/Spectrum | $150 transfer |
| 2/25/2025 | 13:13:17 | 144.253.77.62 | Charter/Spectrum | $5,000 transfer |
| 3/6/2025 | 9:39:29 | 144.253.77.62 | Charter/Spectrum | $3,000 transfer |
| 3/10/2025 | 15:23:01 | 75.133.157.94 | Charter/Spectrum | $7,500 transfer |
| 3/18/2025 | 13:58:25 | 12.75.129.62 | AT&T | $2,500 transfer |
| 3/24/2025 | 16:36:25 | 75.133.157.94 | Charter/Spectrum | $5,000 transfer |
| 4/1/2025 | 9:11:27 | 144.253.77.62 | Charter/Spectrum | $1,000 transfer |
| 4/3/2025 | 11:58:45 | 144.253.77.62 | Charter/Spectrum | $1,500 transfer |

71.     Based on my training and experience, I am aware that financial fraud schemes typically require the use of digital devices, including personal computers and mobile telephones. These devices are necessary for the fraudsters to produce documentation to provide to their victims, to engage in financial transactions, including the movement of funds between accounts, to monitor bank accounts into which deposits of victim funds are made, and to communicate with fellow conspirators, as well as their victims. Based on my investigation in this case, I am aware that victim investors were provided with digitally produced documentation demonstrating

purported account balances and returns.  I am also aware that records containing evidence of fraud schemes may be kept in multiple formats, including both digital and hard copy.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

72.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the **Subject Premises**, in whatever form they are found, including locked storage or filing cabinets.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

73.     *Probable cause.*  I submit that if a computer or storage medium is found on the **Subject Premises**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition,

a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.  Based on actual inspection of other evidence related to this investigation, including financial records and account statements, I am aware that computer equipment was used to generate, store, and print documents used in the bank fraud conspiracy and scheme.  There is reason to believe that there is a computer system currently located on the **Subject Premises**.

74.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files and information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **Subject Premises** because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer

and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the

computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

75. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an

image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

      c.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

76.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### CONCLUSION

77.   Based on the foregoing I submit that this affidavit supports probable cause for a warrant to search the **Subject Premises** described in Attachment A and seize the items described in Attachment B.

78.   I further request that the Court order that all papers in support of this application, including the affidavit and warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

I state under the penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Patrick Dallas
Special Agent
Federal Bureau of Investigation

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 this _____18th_____ day of April, 2025.

The Honorable Joseph S. Dueker
UNITED STATES MAGISTRATE JUDGE

34

**ATTACHMENT A**

**4:25 MJ 2124 JSD**

**Property to Be Searched**

The business offices of Johnson & Niswonger Financial Resources, LLC ("**Subject Premises**") located at 27 W. St. Joseph St., Perryville, MO 63775. The **Subject Premises** is located within a two-story brick façade commercial building. The building contains multiple store fronts, with the **Subject Premises** located on the first floor of the building at the south-east corner of the intersection of W. St. Joseph St. and S. Jackson St. The front of the **Subject Premises** faces north on W. St. Joseph St., with a glass front door with the number "27" near the top. The name "Johnson Niswonger" is painted in white letters on the front glass door, as well as on glass windows to the left and right of the front door. The name "Johnson Niswonger" is also painted horizontally in blue letters on a white background above the entrance door, and "JOHNSON" is painted vertically in white letters on a blue background on the front of the building on the right (west) edge.









**ATTACHMENT B**
**4:25 MJ 2124 JMB**
*Property to be seized*

1.     All records and information that constitute contraband, fruits, evidence and instrumentalities concerning violations of 18 U.S.C. § § 1344 (Bank Fraud) and 1349 (Conspiracy to Commit Bank Fraud), involving James F. JOHNSON and Darrell NISWONGER and occurring from August 2006 to the date of the execution of this warrant, including, but not limited to:

2.     Communications with client investors regarding investments or loans;

3.     Documents related to client contacts or solicitations for investments and/or loans with JOHNSON & NISWONGER FINANCIAL RESOURCES LLC, JAMES JOHNSON, and/or DARRELL NISWONGER;

4.     Contracts between investors and JOHNSON & NISWONGER FINANCIAL RESOURCES LLC, JAMES JOHNSON, and/or DARRELL NISWONGER;

5.     Federal or state tax returns for JOHNSON & NISWONGER FINANCIAL RESOURCES LLC, JAMES JOHNSON, and/or DARRELL NISWONGER;

6.     Personnel and payroll files and records, including employee lists, documents reflecting names, addresses, duration of employment, personnel files, pay schedules, W-2s, 1099s, tax returns, commissions, duties and reasons for separation or termination from employment of all present and past officers, employees, and independent contractors of JOHNSON & NISWONGER FINANCIAL RESOURCES, LLC;

38

7.    Records related to work schedules, time sheets, appointment books, or any other time and attendance tracking documents for any employees or independent contractors of JOHNSON & NISWONGER FINANCIAL RESOURCES, LLC;

8.    Corporate and business records for JOHNSON & NISWONGER FINANCIAL RESOURCES, LLC such as articles of incorporation, resolutions, minutes of stockholders and board of directors, meetings, records regarding officers' duties and responsibilities, licensing records, property records, and records of corporate structure, control and ownership of JOHNSON & NISWONGER FINANCIAL RESOURCES, LLC;

9.    Bank and brokerage account periodic statements, opening records, checks, wire transfers, check registers, cancelled checks, deposit tickets and records of transfer;

10.    Invoices, purchase orders, credit card information, wire transfers, payments, account statements, and investment records;

11.    Statements of purchases or ownership of municipal bonds, corporate bonds, U.S. Treasury bonds, U.S. Treasury notes, or U.S. Treasury t-bills;

12.    Statements of purchases, ownership, or commissions related to life insurance products including annuities;

13.    Records of health insurance policies and premium payments;

14.    Records of life insurance policies and premium payments;

15.    Accounting/CPA records, reports, or communications;

16.    Calendars, appointment books, telephone message pads, day planners, logs, correspondence, rolodexes, personal digital assistants (PDAs), emails, and address books;

17. Records of control over other areas such as storage units where financial, investment, or other business records may be maintained;

18. Records of control of the premises and things described, namely, utility bills, telephone bills, rent or lease records pertaining to or evidencing ownership or control of the premises to be searched;

19. Any digital device used as a means to commit the violations described above;

20. For any digital device whose seizure is otherwise authorized by this warrant, any digital device that contains or in which is stored records or information that is otherwise called for by this warrant:

   a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

   b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the attachment of other devices;

   d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

   e. evidence of the times the device was used;

f.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

g.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.   records of or information about Internet Protocol addresses used by the device;

i.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.